UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

GREGORY A. WHITE,
        Plaintiff,

v.        08-3268

EUGENE McADORY, et al.,
        Defendants.

## MEMORANDUM ORDER AND OPINION

Before the court are Defendants' summary judgment motion [52] and Plaintiff's response [84]. Defendants, Eugene McAdory, Larry Phillips, Carol L. Adams, Jon M. Heller and Shon C. Orrill move for summary judgment pursuant to Fed. R. Civ. Pro. Rule 56.

### Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(c). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241

F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc*., 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659. It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997).

Background

Plaintiff, Gregory White, is civilly committed to the custody of the Illinois Department of Human Services (Department) pursuant to the Sexually Violent Persons Commitment Act, 725 Ill. Comp. Stat. Ann. 207/1 et seq. (West 2008) (SVP Act). Plaintiff brings his complaint pursuant to 42 U.S.C. §1983, against the former Secretary of the Department of Human Services, Carol Adams, the Rushville Treatment and Detention Facility (Rushville) Director, Larry Phillips, the Director of Security for the Rushville, Eugene McAdory, and two Security Therapy Aids, Shon Orrill and Jon Heller, also employed at Rushville. Plaintiff alleges his rights under the Constitution were violated when he was forced to spend several days in the Special Management Unit ("SMU") at the Rushville without toilet paper in April and October of 2008. Plaintiff also alleges defendants McAdory, Heller, and Orrill used excessive force against him on October 16, 2008 and all defendants were deliberately indifferent to his serious medical needs as a result of the force.

Undisputed Material Facts[1]

1. Plaintiff alleges he was placed in a cell in Special Management Unit on April 21, 2008 and spent approximately 2 - 5 days there (Plaintiff's Dep., p. 26, l. 10 - p. 27., l. 5).
2. During the time Plaintiff was in the Special Management cell in April, 2008, he did not see defendant McAdory and defendant McAdory did not observe the condition of Plaintiff's cell (Plaintiff's Dep., p. 27, l. 6 - 16).
3. None of the other named defendants observed the conditions of the cell in Special

---

[1]Exhibits can be found attached to Defendants' Summary Judgment Motion [52], except Plaintiff's Affidavit can be found attached to his Response , unless otherwise noted.

Management Unit in April, 2008 (Plaintiff's Dep., p. 27, l. 17 - p. 28, l. 5).
4.       Plaintiff did not complain directly to McAdory about the alleged lack of toilet paper, rather he complained to "staff." (Plaintiff's Dep., p. 28, l. 6 - 13).
5.       Plaintiff believes McAdory knew of his complaints because "staff" told him McAdory said he "got nothing coming." (Plaintiff's Dep., p. 28, l. 11 - p. 29, l. 6).
6.       McAdory never told Plaintiff he was not entitled to have toilet paper (Plaintiff's Dep., p. 29, l. 7 - 10).
7.       Plaintiff never spoke directly with Adams or Phillips about the lack of amenities in Special Management in April 2008 (Plaintiff's Dep., 32, l. 9 - p. 33, l. 5).
8.       Defendant Phillips never saw the conditions of Plaintiff's cell in Special Management in April, 2008 (Plaintiff's Dep., p. 33, l. 6 - 12).
9.       Plaintiff believes defendant Phillips knew about the conditions of his cell because he wrote grievances and he believes Phillips signs off on all the grievances. (Plaintiff's Dep., p. 33, l. 12 - 21).
10.      Plaintiff did not submit any grievances about the conditions of his Special Management cell until after he was out of Special Management lockdown and had already received toilet paper (Plaintiff's Dep., p. 33, l. 22 - p. 35, l. 5).
11.      Plaintiff received toilet paper after the 2 - 5 days on Special Management lockdown (Plaintiff's Dep., p. 34, l. 19 - 23).
12.      Plaintiff's allegations against defendant Adams are that he wrote her "numerous letters" going back to Joliet (Plaintiff's Dep., p. 36, l. 14 - p. 37, l. 4).
13.      Plaintiff has never met defendant Adams, and she never personally observed the conditions of his cell in Special Management in April, 2008 (Plaintiff's Dep., p. 37, l. 5 - 17).
14.      Plaintiff did not direct any correspondence to defendant Adams about the allegations of April 2008 until after he had already received toilet paper (Plaintiff's Dep., p. 37, l. 18 - 22).
15.      Defendant Adams never responded personally to Plaintiff's many letters, but he has received responses from Laura Wickman Jones (Plaintiff's Dep., p. 36, l. 14 - p. 38, l. 15).
16.       Plaintiff does not have any claims against defendants Heller or Orrill regarding the April, 2008 incident (Plaintiff's Dep., p. 38, l. 16 - 19).
17.      Plaintiff does not allege inappropriate force was used against him on April 21, 2008 (Plaintiff's Dep., p. 45, l. 23 - p. 46, l. 2).
18.      Plaintiff alleges he had no toilet paper in his Special Management cell on October 16, 2008 (Plaintiff's Dep., p. 47).
19.      On October 16, 2008, Plaintiff saw 10 - 15 or 20 STAs running by him, followed by defendant McAdory. Plaintiff made the comment, "the goon squad going by . . .and I said look at the master leader." (Plaintiff's Dep., pp. 48 - 51, l. 12).
20.      Plaintiff was told to cuff up on October 16, 2008 by security staff (Plaintiff's Dep., p. 49, l. 8 - p. 50, l. 3).
21.      Plaintiff does not know whether McAdory heard the "goon squad" or "leader" remark (Plaintiff's Dep., p. 51, l. 13 - l. 17).
22.      Plaintiff admits Heller and Orrill did not use "excessive force" on him while walking him

to the Special Management Unit (Plaintiff's Dep., p. 56, l. 24 - p. p. 57, l. 1).
23. When first placed in the Special Management cell by Heller and Orrill, Plaintiff did not complain about the lack of toilet paper (Plaintiff's Dep., p. 58, l. 10 - 17).
24. Plaintiff does not know who he alleges slammed him against the wall and struck him in the kidney area in the Special Management cell (Plaintiff's Dep., p. 58, l. 18 - p. 24).
25. McAdory came down to the cell with 10 or 20 STAs after Orrill and Heller left the cell, closed the door, and some time had passed (Plaintiff's Dep., p. 61, l. 1 - 16).
26. Plaintiff admits he curses at staff when he feels he is treated disrespectfully and admits cursing at staff both before and after Orrill and Heller left his cell in Special Management Unit (Plaintiff's Dep., p. 63, l 15-24 and p. 64, l).
27. McAdory came into Plaintiff's cell in Special Management Unit and hooked leg shackles through his handcuff and told him to stand up and said, "let's go." (Plaintiff's Dep., p. 65, l. 10 - p. 69, l. 2; McAdory's Affidavit).
28. McAdory pulled the shackle through the chuckhole in Plaintiff's door and hooked the other end to the door handle and shut the door (Plaintiff's Dep., p. 69, l. 3 - 19; McAdory Affidavit).
29. Plaintiff does not know if Orrill was present when he alleges Heller pulled on his cuffs through the chuckhole (Plaintiff's Dep., p. 72, l. 20 - 23).
30. Plaintiff does not know who twisted his cuffed hands when they were out of the chuckhole (Plaintiff's Dep., p. 73, l. 4 - 11).
31. Plaintiff admits once the cuffs were off, all of the individuals left the area (Plaintiff's Dep., p. 73, l. 12 - 19).
32. After defendants McAdory and the other 10-20 people Plaintiff alleges were around his cell left, Plaintiff alleges he pushed on the intercom to tell them he wanted to see a nurse (Plaintiff's Dep., p. 73, l. 18 - p. 74, l. 3).
33. Approximately 5 - 10 minutes after Plaintiff alleges he asked his neighbor to summon a nurse, Nurse O'Donnell came to the neighbor's cell and Plaintiff asked her to look at his wrists (Plaintiff's Dep., p. 75, l. 13 - p. 76, l. 18).
34. Plaintiff states that Nurse O'Donnell observed his wrists through the window and told him to put ice on them (Plaintiff's Dep., p. 77, l. 12 - 16).
35. Plaintiff does not believe you can see properly through the window in the cell (Plaintiff's Dep., p. 77, l. 15-16).
36. Plaintiff admits he probably refused an assessment from a mental health professional on October 17, 2008 (Plaintiff's Dep., p. 78, l. 21 - p. 79, l. 4).
37. Plaintiff states he was in the Special Management cell in October, 2008 for approximately 2 - 5 days (Plaintiff's Dep., p. 80, l. 8 - 12).
38. Plaintiff agrees that defendants Phillips and Adams were not near his cell on October 16, 2008 (Plaintiff's Dep., p. 81, l. 1 - 16).
39. Plaintiff is "pretty sure" that Orrill and Heller worked on the day shift on his unit during the 2 - 5 days he was in the Special Management cell, but is not sure if he complained to them about the alleged lack of toilet paper in his cell (Plaintiff's Dep., p. 81, l. 17 - p. 82, l. 11).
40. Plaintiff admits that he did not see McAdory during the time he was in the Special Management cell after the first day and did not complain to him about the lack of toilet

4

paper (Plaintiff's Dep., p. 82, l. 12 - 14).
41. Plaintiff admits that he did not see Larry Phillips or Carol Adams while he was in the Special Management cell in October, 2008 and did not complain to them about the lack of toilet paper during that time (Plaintiff's Dep., p. 82, l. 15 - 20).
42. Plaintiff did not write to Adams or Phillips about his allegations until after he was out of Special Management Unit (Plaintiff's Dep., p. 82, l. 15 - p. 83, l. 6).
43. Plaintiff was found guilty by the behavioral committee of refusing to comply with facility operations and was placed in Special Management and dropped a status (Plaintiff's Dep., p. 84, l. 24 - p. 85, l. 19).
44. Plaintiff bases his complaints for deliberate indifference to serious medical needs against Phillips and Adams because he had written numerous letters and complaining to them about unrelated incidents, and they could have read his medical records or his grievances (Plaintiff's Dep., p. 86, l. 11 - p. 89, l. 9).
45. Plaintiff admits he has had no physical interactions or uses of force by defendants Heller or Orrill since the incident of October 16, 2008 (Plaintiff's Dep., p. 92 & 93).
46. Plaintiff admits that his status was changed by the "Liberty defendants," not the state defendants (Plaintiff's Dep).
47. On October 16, 2008, Shon Orrill and Jon Heller were Security Therapy Aids I whose duties included supervising the residents of the facility and helping to maintain the safety and security of the institution (Orrill Affidavit; Heller Affidavit).
48. On October 16, 2008, Eugene McAdory was the Director of Security for the Rushville facility who was responsible for supervising the security staff and maintaining the safety and security of the facility (McAdory Affidavit).
49. On October 16, 2008, because of a disturbance in the Special Management Unit, protocol dictated that the residents in the adjacent units were to be locked in their cells (Orrill Affidavit, Heller affidavit, McAdory Affidavit).
50. The residents were informed to go to their cells by the control officer over the intercom system, and the STAs were to assist in getting the residents secured (McAdory Affidavit).
51. The residents are secured during disturbances or medical emergencies and movement in the facility is suspended because it is not uncommon for residents to become excited and unmanageable during those situations, and securing the area helps to avoid an unsafe and unhealthy environment for those who have to respond to an emergency (McAdory Affidavit).
52. Plaintiff became verbally abusive (Heller Affidavit; Orrill Affidavit; Plaintiff's Deposition pgs. 63 and 64 ).
53. While the STAs were locking the residents into their cells, defendant McAdory responded to the medical emergency (McAdory Affidavit).
54. McAdory received a call from STAs informing him that Plaintiff refused to go to his cell and that he was trying to encourage other residents to refuse to go to their cells (McAdory Affidavit).
55. Plaintiff was left in his cell, cuffed, for a few minutes until the ill resident could be evacuated to the hospital (McAdory Affidavit).
56. When McAdory returned to Plaintiff's cell, he walked in, attached a leg shackle to the

5

cuff, and Mr. White walked over to the door (McAdory Affidavit; Orrill Affidavit; Heller Affidavit).

57. McAdory pulled the leg shackle chain through the chuckhole in the door and attached the end to the door handle (McAdory Affidavit).
58. In order to remove a resident's cuffs, the resident is placed with his back against the closed door and he puts his wrists through the chuckhole so the cuffs can be unlocked. This ensures that the resident cannot pull partially opened cuffs, with the cuff key attached, back into the cell (McAdory Affidavit).
59. This also ensures that staff remains as safe as possible (Heller Affidavit; Orrill Affidavit).
60. The cuffs were then pulled through the chuckhole, each of Plaintiff's arms stabilized by a staff member, and the cuffs were removed (McAdory Affidavit; Heller Affidavit; Orrill Affidavit).
61. The plaintiff was verbally abuse towards Heller, Orrill, and McAdory. (Heller Affidavit; McAdory Affidavit; Orrill Affidavit).
62. None of the defendants noted any obvious injuries on Plaintiff's wrists (McAdory Affidavit; Heller Affidavit; Orrill Affidavit).
63. On October 16, 2008, at approximately 2:00 p.m., Nurse O'Donnell was taking medication to another resident on the SMU, at which time she was stopped by Plaintiff who complained he had an altercation with Security Therapy Aids and hurt his wrists (O'Donnell Affidavit; Incident Report; Plaintiff's Medical Records).
64. Nurse O'Donnell examined Plaintiff's hands and wrists at his cell (O'Donnell Affidavit; Incident Report).
65. O'Donnell noted Plaintiff's left wrist was somewhat reddened.and he had full range of motion of both wrists (O'Donnell Affidavit; Incident Report; Plaintiff's Medical Records).
66. Per Protocol, O'Donnell advised Plaintiff to apply ice to his hand and wrist, 15 minutes on and 15 minutes off (O'Donnell Affidavit; Incident Report; Plaintiff's Medical Records).
67. O'Donnell also advised Plaintiff that nursing staff would monitor the wrist to make sure there was no injury (O'Donnell Affidavit).
68. Had there been any bleeding noted to his wrists, or if there was any swelling, or other indication of a possible broken bone, O'Donnell would have cleaned the wrists to see the extent of the damage and would have referred him to a physician for follow-up (O'Donnell Affidavit).
69. No such referral was necessary at that time (O'Donnell Affidavit).
70. Plaintiff had medication ordered four times per day (O'Donnell Affidavit).
71. Residents can bring up ongoing medical issues during the medication lines and nursing staff can observe and monitor injuries (O'Donnell Affidavit).
72. After three days, nurse O'Donnell had no occasion to review Plaintiff's complaints regarding his wrists or to refer him to a physician (O'Donnell Affidavit).
73. O'Donnell is familiar with the cosmetic items given to the residents on Special Management Unit, and has never seen a resident go without toilet paper such that they would be required to use their hand for that purpose (O'Donnell Affidavit).
74. O'Donnell has never known of any staff member to refuse a residents request for soap or

toilet paper (O'Donnell Affidavit).
75. Dr. Lochard is familiar with Plaintiff, has treated him and reviewed his medical records (Lochard Affidavit).
76. According to the medical records available at the Rushville Facility, Plaintiff has a long history of complaints related to his neck, back, and upper extremities, at least as far back as July, 1998, when Plaintiff was seen in the Neurology Clinic at the University of Illinois-Chicago with complaints of neck and low back pain, as well as headache and numbness in both arms (Lochard Affidavit).
77. On September 1, 2006, Plaintiff was seen in the UIC Orthopedic Clinic for complaints of pain in the neck as well as pain and numbness radiating down both of his arms. Physical exam showed no positive findings, however because of complaints of the radiating pain, an MRI was recommended (Lochard Affidavit).
78. On September 1, 2006, Plaintiff complained to nurses about swelling, redness and pain in his hands and wrists due to the restraints used during the writ. Upon examination by nursing staff, he was found to have redness and swelling in bilateral hands and wrists (Lochard Affidavit).
79. On September 12, 2006, Plaintiff was seen by Orthopedic physicians in Jacksonville for complaints of pain in both hands and for complaints of numbness in the ulnar nerve distribution. He reported to the surgeon that he had been involved in many altercations with security staff and sustained injuries which resulted in persistent numbness in the sensory ulnar nerve distribution and median nerve distribution of both hands (Lochard Affidavit).
80. Nothing specific was found on the neurological exam, but an EMG/NCS was ordered, and on October 9, 2006, Plaintiff was diagnosed with bilateral carpal tunnel syndrome. Wrist splints were recommended, and it was noted that Plaintiff might need carpal tunnel release surgery in the future (Lochard Affidavit).
81. On April 28, 2008, Plaintiff had right carpal tunnel release surgery and on July 3, 2008, Plaintiff had left carpal tunnel release surgery (Lochard Affidavit).
82. Carpal Tunnel Syndrome is a repetitive motion injury that causes pain or numbness affecting some part of the median nerve distribution of the hand and may radiate into the arm. It is not generally caused by intermittent constriction of the wrists such as that associated with the use of handcuffs (Lochard Affidavit).
83. Plaintiff's medical records reflect he was seen in the Health Care Unit on October 22, 2008, for complaints of headache and was seen for blood pressure checks on October 24, 2008, October 30, 2008, November 3, 2008, and November 7, 2008. At no time during those visits to the Health Care Unit was it noted that he complained of any pain to his wrists and hands (Lochard Affidavit)[2].
84. Plaintiff complained of bilateral forearm and hand pain and numbness while in Physical Therapy on November 20, 2008 (Lochard Affidavit).

---

[2]In his affidavit Plaintiff claims he complained several times of pain to his wrists and hands. The court notes Plaintiff did not list this as an additional fact. Further, Lochard is only testifying as to what was not documented in Plaintiff's medical records.

85. Dr. Lochard examined Plaintiff on December 8, 2008, at which time Plaintiff complained of his wrists and hands tingling. He stated at that time that he has had the symptoms since October 16, 2008 (Lochard Affidavit).
86. During that visit, Plaintiff reported no weakness and stated he was compliant with the grip strengthening exercises that were prescribed after the carpal tunnel release surgeries. He did not report much pain in his wrists (Lochard Affidavit).
87. Upon examination at that time, Dr. Lochard noted Plaintiff's hands exhibited well developed musculature, that his grips were good bilaterally, and that there was no swelling or tenderness to his wrists. His neurological exam was consistent with post carpal tunnel release surgery, and Plaintiff was reassured that the tingling from strain would go away and he was told to continue the grip strengthening and stretching (Lochard A ffidavit).
88. At no time did Dr. Lochard see any symptoms consistent with a re-injury of his wrists after the surgery (Lochard Affidavit).
89. Plaintiff was discharged from physical therapy on January 1, 2009, due to inconsistent attendance and availability (Lochard Affidavit).
90. Though Plaintiff continued to complain of neck, shoulder and upper arm pain, as of December 2, 2009, because MRI did not show any abnormalities, there was no indication to refer him to another surgeon for treatment of his pain (Lochard Affidavit).
91. While Plaintiff complained of symptoms consistent with carpal tunnel syndrome after an alleged altercation with staff on October 16, 2008, those symptoms are not uncommon after carpal tunnel release surgery and would subside with time and prescribed exercises. Dr. Lochard saw no evidence, either in his medical records, or upon his examination in December of 2008, that Mr. White sustained an additional injury to his wrists on October 16, 2008 (Lochard Affidavit).

Disputed Material Facts

92. All of the residents, except Mr. Gregory White complied with the order to return to their cells to be secured (Heller Affidavit; Orrill Affidavit, Plaintiff's Affidvit).
93. Plaintiff refused orders to enter his cell to be locked up and became verbally abusive (Heller Affidavit; Orrill Affidavit, Plaintiff's Affidavit).
94. McAdory left the area and went to assist the STAs who were dealing with Plaintiff (McAdory Affidavit, Plaintiff's Affidavit).
95. Plaintiff was cuffed when McAdory arrived to assist, but Plaintiff was loud and verbally abusive, and continued to try to encourage the other residents to refuse to be secured (McAdory Affidavit, Plaintiff's Affidavit).
96. McAdory told STAs Heller and Orrill that if Plaintiff would not comply, to take him to a cell in the Special Management Unit (SMU)(McAdory Affidavit; Heller Affidavit; Orrill Affidavit, Plaintiff's Affidavit).
97. After walking to the cell in Special Management Unit, Plaintiff was placed against the wall face first, so his cuffs could be removed, but he continued to be combative, and refused to allow staff to remove his cuffs (McAdory Affidavit, Heller Affidavit, Orrill Affidavit, Plaintiff's Affidavit).

8

98. Although Plaintiff walked to the door, because he was non-compliant with removing the cuffs, McAdory pulled the leg shackle chain through the chuckhole in the door and attached the end to the door handle (McAdory Affidavit, Plaintiff's Affidavit).
99. Mr. White continued to be combative, pulling and jerking on the cuffs, until he appeared to become tired (McAdory Affidavit, Plaintiff's Affidavit).
100. Per protocol, McAdory asked if Plaintiff wanted to see a nurse, but Plaintiff replied, "I don't have to see a nurse you black nigger son of a bitch. I'll kill you!" (McAdory Affidavit, Plaintiff's Affidavit).
101. When Heller and Orrill asked if Plaintiff wanted to see a nurse, he replied, "Fuck you!" (Heller Affidavit; Orrill Affidavit, Plaintiff's Affidvit).
102. O'Donnell noted there was no swelling or bleeding of the wrist. There were no abrasions to either wrist (O'Donnell Affidavit; Incident Report; Plaintiff's Medical Records).
103. Plaintiff would usually refuse his 8:00 a.m. medication and would refuse any time he was on the phone (O'Donnell Affidavit, Plaintiff's Affidavit).
104. At the evening medication line on October 16, 2008 at approximately 8:00 or 9:00 p.m., O'Donnell again observed Plaintiff's wrists. There was still no bleeding, excoriation, or swelling, and she advised him he would continue to be monitored and to use the ice (O'Donnell Affidavit, Plaintiff's Affidavit).
105. Plaintiff refused the ice on October 16, 2008 (Bierman note on Heller/Orrill Incident Reports attached, Plaintiff's Affidavit).
106. Plaintiff refused medication line for the next three days (O'Donnell Affidavit).
107. Plaintiff's medical records reflect he was seen in the Health Care Unit on At no time during Plaintiff's October 22, 2008, October 24, 2008, October 30, 2008, November 3, 2008, and November 7, 2008 visits to the Health Care Unit was it noted that he complained of any pain to his wrists and hands (Lochard Affidavit, Plaintiff's Affidavit).

Discussion and Conclusion

Claims brought pursuant to 42 U.S.C. § 1983, when involving detainees, arise under the Fourteenth Amendment and not the Eighth Amendment. *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000). The Seventh Circuit, however, has "found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) without differentiation." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005); *see also Brown v. Budz*, 398 F.3d 904, 910 (there is little practical difference between Eighth Amendment and Fourteenth Amendment standards). The core judicial inquiry in determining whether an official used excessive force in violation of the Eighth Amendment is whether the force was applied in a good-faith effort to maintain or restore discipline rather than to maliciously and sadistically cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6-9 (1992). There are several factors used to determine if excessive force was used, including "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Filmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (*citing DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 1999)). With regard to the extent of injury inflicted, a plaintiff cannot state a claim for excessive force under

the Eighth Amendment on a de minimis use of physical force. *Outlaw v. Newkirk*, 259 F.3d 833, 838 (7th Cir. 2001). De minimis uses of physical force are excluded from constitutional recognition if the use of force . . . is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10.

The court notes that in his complaint, Plaintiff alleges that Defendants Orrill and Heller used excessive force against him when one of them put the handcuffs on too tight, when they slammed him against the wall and at least one of them punched him several times, while the other did nothing. However, when Plaintiff responding to Defendants' summary judgment motion, he did not raise any facts regarding the alleged excessive force. At summary judgment stage, the court does not look to the complaint for Plaintiff's facts. The court looks at supported facts set out in the summary judgment motion and response. The only statement made in the above facts regarding excessive force is "Plaintiff does not know who he alleges slammed him against the wall and struck him in the kidney area in the Special Management cell (Plaintiff's Dep., p. 58, l. 18 - p. 24)." No where in any fact does any party say Plaintiff was slammed against a wall; punched by either Orrill or Heller while the other stood by and did nothing; or that his handcuffs were placed on too tight. On this record, the court finds the Defendants are entitled to summary judgment on Plaintiff's claim of excessive force.

Furthermore, even if there had been excessive force, in order to impose individual liability under 42 U.S.C. §1983, a plaintiff must prove that the defendant had some personal responsibility for the alleged violation. *Duckworth v. Franzen*, 780 F.2d 645 (7th Cir. 1985). The personal responsibility requirement of §1983 is satisfied if he or she acts or fails to act with a deliberate or reckless disregard of Plaintiff's constitutional rights or 2) if the conduct causing the constitutional deprivation occurs at her knowledge and consent. *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). In this case, neither McAdory, Phillips nor Adams were in the area to see the alleged force, nor were they alleged to have taken part in the force. Therefore, they have insufficient personal involvement in the alleged constitutional violation, and are entitled to summary judgment.

Even if Plaintiff was injured by Defendants as alleged in his complaint, Plaintiff received medical attention by a nurse shortly after the alleged injury. Furthermore, the record before this court shows Plaintiff received further medical treatment when he visited the Health Care Unit on October 22, 2008, October 24, 2008, October 30, 2008, November 3, 2008, and November 7, 2008. None of the defendants are medical professionals. No inference of deliberate indifference arises on the part of these nonmedical defendants. In the context of medical treatment, "if a prisoner (or detainee) is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . ." *Greeno v. Daley,* 414 F.3d 645, 656 (7th Cir. 2005). Defendants are entitled to summary judgment on Plaintiff's claim of deliberate indifference to his serious medical needs.

The court notes that in his complaint, Plaintiff alleges that he did not have toilet paper in his cell for several days. However, when Plaintiff responding to Defendants' summary judgment motion, he did set forth any facts on this claim. At summary judgment stage, the court does not

look to the complaint for Plaintiff's facts. The court looks at supported facts set out in the summary judgment motion and response. However, because the Defendants set for at least one fact – Plaintiff received toilet paper after the 2 - 5 days on Special Management lockdown- the court can infer that Plaintiff was without toilet paper for at least a few days in April 2008. Further, the court will consider his claim that he did not have toilet paper when he was on lockdown in October 2008.

The Eighth (and Fourteenth) Amendment requires that residents be housed under "humane conditions" and provided with "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). To be liable for the conduct of others, an individual must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chi.*, 856 F.2d 985, 992-93 (7th Cir. 1988). In this case, the only claim for conditions of confinement is Plaintiff's claim that on two separate occasions, beginning April 21, 2008 and October 16, 2008, Plaintiff was forced to remain in the SMU without toilet paper.

Plaintiff admits he does not have any claim against defendants Heller and Orril arising from the April, 2008 incident. He also admits that none of the defendants, including, McAdory, Phillips and Adams observed the conditions of his cell during the April 21, 2008 visit to SMU that lasted approximately two to five days, and he never spoke directly with any of the defendants about the conditions in April, 2008. Plaintiff believes that McAdory knew about the conditions because he had complained to "staff" and "staff" told him that McAdory said "he got nothing coming." Plaintiff admits, though, that McAdory never told him that he was not entitled to toilet paper. However, even if it's true that staff talked to McAdory, Plaintiff has no way of knowing what was said, or what the "nothing coming" means. No reasonable jury could find that McAdory had actual knowledge that McAdory knew Plaintiff was without toilet paper rather than some other request. Plaintiff bases his case against defendant Phillips, the facility director, and defendant Adams, the former Secretary of the Department of Human Services, on the fact that he wrote letters and grievances. However, Plaintiff admits that he did not write any of the letters or grievances until after he was out of SMU, and had already received toilet paper. There is insufficient evidence for a rational jury to find that defendants were aware that Plaintiff was subjected to inhumane conditions in the Special Management Unit during the time he alleges it

was occurring, and when they could have done something about it. Therefore, each defendant is entitled to summary judgment in their favor.

Plaintiff also alleges he had no toilet paper in his cell when he was placed in SMU on October 16, 2008. However, Plaintiff admits he did not complain to the defendants about the lack of toilet paper on October 16, 2008 when they put him in the cell. He also admits that staff, including the defendants, left the area after he was secured and his cuffs removed. He admits he did not see McAdory, Phillips or Adams while he was in the SMU in October of 2008. Also, though he is "pretty sure" that defendants Orrill and Heller worked on the day shift on this unit during the two to five days he spent on the SMU, he is "not sure" if he complained to them about the lack of toilet paper. It is clear that Plaintiff cannot establish that, even if he was without

11

toilet paper in his SMU cell in October 16, 2008, any of the defendants had personal knowledge of that fact such that they could be liable under the Constitution. Therefore, each of these defendants are entitled to summary judgment in their favor.

It is therefore ordered:

1. The defendants' motion for summary judgment [52] is allowed. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. The case is terminated. The parties are to bear their own costs.
2. If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C).

Enter this 30th day of March 2011.

**\s\Harold A. Baker**
_____
Harold A. Baker
United States District Judge